IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DEBRA JEAN HUICHAN,

                        Plaintiff,                           OPINION AND ORDER

        v.                                                    20-cv-181-wmc

ANDREW M. SAUL,
Commissioner of Social Security,

                        Defendant.

        In this case, plaintiff Debra Jean Huichan seeks judicial review of a final decision of

the Commissioner of Social Security denying her claim for disability insurance benefits.

On appeal, plaintiff took a scattershot approach but principally argues that the ALJ erred

in:  discounting two medical opinions, assessing Huichan's residual functional capacity

("RFC"), and assessing her credibility.  For the reasons discussed below, the court finds

plaintiff's arguments unpersuasive and will uphold the ALJ's decision.  The oral argument

that had been previously scheduled for Friday, December 4, 2020, is cancelled.


                            BACKGROUND

A. **Disability Application**

        On February 6, 2017, plaintiff Huichan filed an application for a period of disability

and disability insurance benefits, alleging disability based on various physical and mental

impairments.  Her date last insured was September 30, 2017, as that was the last day of

the last quarter she met insured status for disability.  Thus, the period relevant to Huichan's

claim is quite narrow -- from February 6, 2017, through September 30, 2017.[1]

### B. Medical Evidence

#### 1. Treatment Records

Prior to her alleged onset date, Huichan's medical records indicate that she had a history of: addiction to opiates, for which she received counseling and prescriptions to methadone (AR 316-25, 337-39, 341-48); treatment and counseling for substance abuse, depression, and anxiety (AR 330-96); right knee injury and pain, for which she underwent three arthroscopic surgeries (AR 398-99, 420); Graves' disease/thyroid problems (AR 399); degenerative disc disease, scoliosis, and pain in the thoracic spine (AR 399-400); obesity (AR 398); and acid reflux/gastrointestinal reflux disease ("GERD") (AR 398).

Huichan's primary treating physician was Dr. Matthew Swedlund, M.D., who she began seeing at least since August 2016 and continued to see at the UW Health Yahara Clinic during the period relevant to her disability application. (AR 671.) In particular, on May 9, 2017, she saw Dr. Swedlund for a general follow-up appointment regarding her medications. (AR 685-87.) At that time, she was enrolled in a methadone clinic, for which drug screening tests were required, and she expressed concern that her prescription medications were causing false positive results on those tests. (AR 685-87.) Dr. Swedlund wrote that he did "not have much suspicion that she is continuing to abuse opiates," but that the cause of the false positives was "unclear" as she was not on any medications that

---

[1] "The date last insured (DLI) is the last day of the quarter a claimant[] meets insured status for disability or blindness. For title II Disability Insurance Benefit (DIB) claims, adjudicators cannot establish onset after the DLI." Program Operations Manual System ("POMS") 25501.320.

should cross react with an opiate immunoassay.  (AR 687.)

During that same appointment, Huichan reported significant acid reflux and leg swelling.  (AR 686.)  In examining Huichan, Dr. Swedlund noted an edema on her left shin and obesity, but otherwise her physical findings were generally normal.  (AR 687.)  As to Huichan's mental status, Swedlund wrote:  "Normal mood and affect.  Normal speech, thought process and content.  Intact judgment and insight."  (AR 687.)  Still, Dr. Swedlund expressed concern about Huichan's over-use of ranitidine for acid reflux, and adjusted her prescriptions.  (AR 687.)  He also gave her a second prescription for a set of compression hose to treat her edema, after reportedly giving her previous pair to her father once she stopped using them.  (AR 687.)

In terms of follow-up care, Dr. Swedlund ordered a lab test, which showed normal metabolic results but an elevated TSH level.  (AR 685.)   Based on this result, Huichan was advised over the phone to take her thyroid medication on an empty stomach, rather than after eating as she had been.  (AR 685.)  Based on concerns that her edema was related to a potential cardiac problem, Dr. Swedlund also ordered an echocardiogram, which ultimately came back normal.  (AR 681.)

On May 26, 2017, Huichan called the Yahara Clinic twice, complaining that her knee had "been catching," that she could not bend it, and that it hurt.  (AR 684.)  After scheduling an office visit for the following week, however, she missed that appointment. (AR 684.)  Then, on June 13, 2017, Huichan had an office visit with Dr. Swedlund, during which her primary complaints were abdominal pain and dyspnea on exertion, rather than any recurring knee pain.  (AR 681-82.)  Dr. Swedlund again noted Huichan's obesity and

also referenced her reported memory deficits.  (AR 682.)  Huichan reported that she was "not able to remember things quite as well" and was concerned, but that she did not have difficulty getting lost while driving and did not forget who people are.  (AR 682.)  As follow-up, Dr. Swedlund ordered a CT scan for the abdominal pain (AR 682), but the results were normal (AR 680).

On June 19, 2017, Huichan again called the Yaraha Clinic to request a medication change, as she believed her pantoprazole prescription (for acid reflux/GERD) was causing her weight gain, abdominal pain, and leg swelling.  (AR 679-80.)  Over the phone, Huichan was advised that she could stop the pantoprazole and switch to over-the-counter zantac instead.  (AR 679.)  On June 28 and July 3, 2017, Huichan called the Clinic twice more to report weight loss and that she was "feeling great" and "walking a lot more."  (AR 679.)

On July 26, 2017, Huichan called the Clinic again expressing concern that her prescription medication -- in particular her ranitidine, of which she would take 8-32 pills a day to control heartburn -- was causing false positive drug tests and that she was going to get kicked out of the methadone clinic.  (AR 677.)  At that time, Dr. Swedlund wrote that: this problem had been "repeatedly discussed" with her; she could not continue to take that much ranitidine; he suggested a treatment plan to back up on her ranitidine usage; and he ordered an esophagogastroduodenoscopy ("EDG") to "investigate for [an] esophageal issue."  (AR 677-78.)

On July 31, 2017, Huichan underwent a first EDG, but had to be rescheduled for a repeat procedure on September 6, 2017, after waking up under light anesthesia.  (AR 673-

74, 671.)[2]  On August 21, 2017, she returned for a preoperative history and physical with Paul Pankratz, P.A.  (AR 671.)  Pankratz conducted a physical exam and noted that her results were generally normal, except that her BMI was 56.8.  (AR 672.)  In his assessment, Pankratz also wrote that Huichan reported significant GERD, although it was "[u]nder better control" on her current medications.  (AR 672.)  Pankratz further noted her history of smoking, obesity, scoliosis, insomnia, asthma (under "[g]ood control on current mediations"), stable hypothyroidism, and "status post right knee arthroscopy x3."  (AR 672.)  As for her mental status, Pankratz observed:  "Alert and oriented times 3.  Cranial nerves 2-12 are grossly intact.  All responses to questions are appropriate.  Cerebellar testing is within normal limits and symmetrical."  (AR 672.)  Finally, in his assessment, Pankratz noted Huichan's history with depression and anxiety, but wrote that they were "[s]table on current medications."  (AR 672.)[3]

On September 6, 2017, Huichan next met with Tiffany Buchholz, P.A., complaining of cough, hoarseness, sore throat, ear pain, and hot/could sweats.  (AR 669.)  From her examination, Buchholz noted reduced airflow in Huichan's chest with intermittent wheezing and obesity, but otherwise normal findings, including a normal mental status.  (AR 670.)  For treatment, Huichan's medications were adjusted, she was instructed to use

---

[2] It is not clear whether or not this repeat procedure was held.  The ALJ did not mention it in his written decision, nor did the parties in their briefing, and the court's review of the medical record did not show evidence of this procedure either.

[3] In her brief, plaintiff cites to this July 2017 record for the proposition that Huichan's "depression and anxiety had been getting worse over the past two or three years."  (Pl.'s Br. (dkt. #13) 4.)  However, this note was included in the history section of the record, and thus does not appear to reflect her mental status in July of 2017.  (See AR 674.)

both of her inhalers regularly, chest x-rays were ordered, and a nebulizer procedure was ordered (and completed that same date).  (AR 670.)

On September 13, 2017, Huichan called the Yahara Clinic because she apparently missed an appointment with Dr. Swedlund the previous day.  (AR 668.)  During the call, Huichan indicated that her "reflux issue is much better," that her false positives at the methadone clinic had stopped, and asked if she needed to reschedule.  (AR 668.)  Dr. Swedlund responded that they could "hold off on a visit for now," requesting that she be scheduled for a physical in 9 months and "have her seen sooner only if she is having issues that need to be addressed."  (AR 668.)

On December 20, 2018, Dr. Swedlund completed an RFC questionnaire.  (AR 845.) While this form was completed after the treatment window, he explained that the earliest date restrictions applied was May 13, 2016 (well before the February 2017 onset date). (AR 849.)  When prompted to describe Huichan's symptoms, he wrote:  "Pain (especially knees), depression, anxiety, leg swelling, skin ulcer, shortness of breath."  (AR 846.)  Then, in the check-box portion of the form, Dr. Swedlund indicated that Huichan:

- Frequently experienced pain of sufficient severity to interfere with attention and concentration.  (AR 847.)

- Had a "marked limitation" in dealing with the normal stresses of competitive employment.  (AR 847.)

- Would be only able to sit continuously at one time for 2 hours and only able to stand continuously at one time for 10 minutes.  (AR 847.)

- Would be able to sit for at least 6 hours in a day, but would only be able to stand/walk for less than 2 hours.  (AR 848.)

- Would need to lie down for 2-4 hours during an average workday.  (AR 848.)

6

- Had no grasping, turning, manipulation, or reaching limitations.  (AR 849.)

- Would need to be absent more than three times a month due to her impairments.  (AR 849.)

Finally, in a short narrative, Dr. Swedlund wrote:  "As noted above, limited standing/walking/lifting.  Needs unrestricted access to restroom."  (AR 849.)

## 2.  Consultative Evaluations

In addition to her normal treatment, Huichan was examined by two consultative doctors at the request of the state agency.  On May 17, 2017, Huichan underwent a physical consultative examination with Dr. Kurt Reintjes, M.D.  (AR 654-57.)  His medical impressions were: (1) "[m]echanical thoracic and lumbar pain associated with congenital dextroscoliosis with associated degenerative changes"; (2) "[r]ight knee pain associated with patellofemoral syndrome"; (3) "[l]eft shoulder pain with decreased range of motion"; (4) "[m]orbid obesity"; (5) "[l]ikely bilateral carpal tunnel syndrome objectively observed today in the left wrist"; (6) "Graves' disease."  (AR 656-57.)

On June 6, 2017, Huichan underwent a second psychological consultative examination with Gordon Herz, Ph.D.  (AR 659-62.)  Herz included the following statement with respect to Huichan's work capacity:

> The claimant is able to understand, remember and carry out simple instructions.  Interactions with supervisors and co-workers are generally likely to be perceived to be satisfactory; however, additionally she is likely to be preoccupied with and return to a focus on personal issues, her mood and subjective difficulties as well as long-standing issues to the extent that these would not necessarily be well-tolerated in an ordinary work setting.  Concentration, attention and work pace are likely to be moderately disrupted at times due to personal preoccupations, mood and pain.  She probably will have

7

> minimal ability to withstand routine work stresses and to adapt
> to changes, particularly if these require her to function beyond
> her subjective capacities and preoccupations at the moment.

(AR 662.)

### C. ALJ Opinion

On May 22, 2019, ALJ David R. Bruce issued a decision denying Huichan's application for disability and disability insurance benefits after evaluation using the five-step sequential method.  At step one, ALJ Bruce found that Huichan had not engaged in substantial gainful activity from her alleged onset date through her date last insured.  (AR 16.)  At step two, he also found that Huichan had the following severe impairments: "obesity, degenerative joint disease (djd) of the right knee; degenerative disc disease (ddd) of the lumbar and thoracic spine; and depression."  (AR 16.)

ALJ Bruce next considered whether Huichan's conditions met or equaled the criteria of a listing-level impairment at step three.  (AR at 32.)  Material to this appeal, the ALJ specifically considered whether plaintiff's mental impairments met the relevant listings.  As part of that analysis, the ALJ considered the "paragraph B" criteria, finding that Huichan had: (1) no limitation in understanding, remembering, or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting, or maintaining pace; and (4) no limitation in adapting or managing oneself.  (AR 18-19.)  Overall, the ALJ concluded that none of Huichan's impairments, either singly or in combination, were presumptively disabling.  (AR 18.)

At step four, the ALJ found that Huichan retained the residual functional capacity ("RFC") to:

> Perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, and crouch but never crawl; no concentrated exposure to unprotected heights, vibrations, moving mechanical parts, and operation of a motor vehicle as part of a job; limits to simple routine tasks and simple work related decisions that I define as svp 1 or svp 2 type jobs; occasional interactions with co-workers, supervisors and the public; simple work related decisions commensurate with unskilled work; any time off task can be accommodated by normal breaks and lunch.

(AR 20.)[4]

In arriving at this formulation, the ALJ reviewed and discussed the evidence in the record, including various medical opinions.  (*See* AR 20-27.)  The ALJ gave Dr. Herz's opinion "great weight as to [Huichan's] ability to understand, remember and carry out simple instructions" but otherwise gave his opinion very little weight.  (AR 25.)  The ALJ also gave very little weight to Dr. Swedlund's opinion.  (AR 25, 26.)  The ALJ further considered Huichan's statements about the intensity, persistence, and limiting effects of her symptoms, but ultimately concluded that they were inconsistent with the evidence in the record.  (AR 24.)

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

In addition, the references above to "svp1" and "svp2" (often denoted in the capital acronym "SVP") refers to "specific vocational preparation," or "[t]he amount of time required for a typical claimant to:  learn the techniques; acquire the information; and develop the facility needed for average performance in a job."  Program Operations Manual System ("POMS") DI 25001.001.  An SVP of 1 indicates that the job can be learned by short demonstration only.  *Id.*  An SVP of 2 indicates that the job requires more than a mere short demonstration, but no more than one month to learn.  *Id.*

Finally, at step 5, the ALJ accepted the vocational expert's testimony that there existed jobs in significant numbers in the national economy that Huichan could perform with the formulated RFC.  (AR 28.)  Accordingly, ALJ Bruce concluded that Huichan was not under a disability and denied her application.  (AR 29.)

OPINION

Judicial review of a final decision by the Commissioner of Social Security is authorized by 42 U.S.C. § 405(g).  An ALJ's findings of fact are considered "conclusive," so long as they are supported by "substantial evidence."  § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In reviewing the Commissioner's findings, the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision.  *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  Even when adequate evidence exists in the record to support the decision, it will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the final conclusion.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 2006).

At the outset, the court notes that plaintiff cited to medical records outside of the

10

relevant time period throughout her briefs to support her arguments. A claimant's alleged onset date is the date that she alleges she meets the definition of disability, SSR 18-1p, and the date last insured is "the last day of the quarter a claimant[] meets insured status for disability or blindness." Program Operations Manual System ("POMS") 25501.320 ("For title II Disability Insurance Benefit (DIB) claims, adjudicators cannot establish onset after the DLI."). Thus, the relevant period here falls between Huichan's alleged onset date of February 6, 2017, and September 30, 2017, the date last insured, and to qualify for disability, the plaintiff must demonstrate disability between these two dates. Since much of the evidence cited by plaintiff either pre-dated or post-dated the relevant period, it is generally not relevant to her claim, although records outside of the treatment window may have some relevance to the extent that they support her allegations of disability during the insured period. *See Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (evidence post-dating date last insured provided "no support for the proposition that she was disabled at any time prior" to her date last insured); *Phelps v. Colvin*, No. 13-CV-1211-CJP, 2014 WL 7360196, at *5 (S.D. Ill. Dec. 23, 2014) (medical treatment outside of the treatment window can be considered "so long as it helps to illuminate her condition during the insured period," although "later medical evidence is of little relevance where it shows that the plaintiff's condition worsened after the date last insured"). With this in mind, the court will now turn to plaintiff's principal arguments.

## I.  Swedlund Opinion

Plaintiff first argues that the ALJ failed to consider properly the opinion offered by Huichan's primary treating physician, Dr. Swedlund. As noted, the ALJ assigned Dr.

Swedlund's overall opinion very little weight, although he partially credited it in limiting Huichan to sedentary work and also considered it insofar as Dr. Swedlund proposed no handling or fingering limitations.  (AR 25-26.)

Under the applicable regulations, a treating source's medical opinion is entitled to controlling weight provided if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  20 C.F.R. § 404.1527(c)(1).  In this case, the ALJ correctly noted that "the objective exam findings and limited conservative treatment" did not support Dr. Swedlund's proposed limitations, and further identified various and specific inconsistences between Dr. Swedlund's opinion and the other evidence in the record.  (AR 25-26.)  Thus, he reasonably concluded that Dr. Swedlund's opinion was not entitled to controlling weight.

If an ALJ does not give the opinion controlling weight, then he must decide what weight should be given by considering, to the extent applicable, specific regulatory factors. *See Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)).  These factors include:  (1) "the treatment relationship's length, nature, and extent"; (2) "the opinion's consistency with other evidence"; (3) "the explanatory support for the opinion"; and (4) "any specialty of the treating physician."  *See id.* (citing 20 C.F.R. § 404.1527(c)).  As reflected in his decision, the ALJ reasonably considered these factors as well.  *First*, he recognized that Dr. Swedlund was Huichan's primary treating physician for multiple years.  (*See* AR 25-26.)  *Second*, he found that Dr. Swedlund's opinion was not consistent with the other evidence in the record.  In contrast to Dr. Swedlund's proposed

mental limitations in particular, the ALJ noted that Huichan presented for treatment during the relevant period as "cooperative, alert, oriented, and in no acute distress." (AR 25 (citing Exhibit 6F).) Those observations were also consistent with other medical evidence reviewed above.[5] Finally, plaintiff fails to point to any treatment records within the relevant time period that support Dr. Swedlund's more restrictive mental limitations.

Similarly, the ALJ reasonably found Dr. Swedlund's opinion that Huichan would need to lie down for two to four hours each day and would miss work more than three times per month was inconsistent with the other medical evidence. (AR 25.) For example, the ALJ noted that during the relevant period, those limitations were not supported by Huichan's treatment record, objective exam findings, conservative treatment, and stable medical conditions. (AR 25.) While plaintiff points out that Huichan complained to treatment providers of fatigue (AR 682), this general complaint by itself is insufficient to require the ALJ to accept Dr. Swedlund's significant proposed limitations at face value. As for the other records cited by plaintiff -- that Huichan was on numerous medications, that she was taking 8-32 ranitidine pills a day, that she had gained 77 pounds in 2017 then lost 34 pounds in one week, etc. -- none are relevant to Dr. Swedlund's proposed limitations. (*See* Pl.'s Br. (dkt. #13) 10.)

Plaintiff would also take issue with the ALJ's characterization of Huichan's treatment as "conservative," but that finding is reasonable on this record. During the

---

[5] Plaintiff faults the ALJ for citing generally to Exhibit 6F, which is 66 pages long, rather than providing specific pincites. (Pl.'s Br. (dkt. #13) 7.) But normal mental status findings are indicated on multiple pages of the 6F file, (*see, e.g.*, AR 687, 682, 672, 670), and the court will not fault the ALJ for not being more precise when the document generally provides support throughout.

relevant period, Huichan attended treatment appointments approximately once or twice a month, although she called in to the clinic rather more frequently. Moreover, the treatment plans during that period largely involved medication tweaks and diagnostic exams (such as the EDG and the echocardiogram), all of which were normal. Indeed, by September of 2017, Dr. Swedlund did not recommend that Huichan make up a missed appointment, and instead suggested she be scheduled for a physical nine months out. (AR 668.) Similar treatment plans have been found to be conservative in other cases. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting claimant's "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session"); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (characterizing painkillers and injections as conservative treatment).

The ALJ also noted that Dr. Swedlund's proposed breaks and absences limitations were not consistent with Huichan's daily activities of going to the Methadone clinic in the morning, visiting her in-laws home for four hours, running errands, going home to get her husband ready for work, and performing household chores. (AR 25.) While plaintiff argues generally that the ALJ "plac[ed] undue weight on a claimant's household activities," it is still appropriate to give evidence of such activities "[s]ome weight." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Here, the ALJ properly considered these activities in the context of the overall medical record, without placing "undue weight" on them.

Finally, Dr. Swedlund opined that Huichan needed to have unlimited bathroom access, but the ALJ "did not see support or subjective reports from the claimant to indicate this limitation in the medical evidence." (AR 26.) Nor did the court. Even plaintiff

generally points out that Huichan has GERD, but the fact that she experiences heartburn and esophageal pain does not logically imply a need for unlimited bathroom access. Moreover, while the evidence indicates some periods of significant GERD symptoms and pain, toward the end of the relevant period, Huichan reported that it was "[u]nder better control" (AR 672) or "much better" (AR 668). Accordingly, the ALJ offered numerous, good reasons for finding that Dr. Swedlund's opinion was inconsistent with the evidence in the record.

Turning to the *third* factor to be considered in assessing the proper weight to be assigned a medical opinion -- explanatory support -- most of the limitations relied upon by plaintiff in Dr. Swedlund's opinion are limited to check-box answers without greater explanation, and so the ALJ acted reasonably in discounting them. As plaintiff acknowledges, "by itself a check-box form might be weak evidence," although she also notes that the Seventh Circuit has found "the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). However, Dr. Swedlund provides no explanation and little to no support for many of the limitations he proposed.

*Finally,* as to Dr. Swedlund's specialty, plaintiff points out that he is a "faculty member at the University of Wisconsin Medical school [with a] specialty in public health and procedures." (Pl.'s Br. (dkt. #13) 13.) But, as the ALJ acknowledged, Dr. Swedlund is an M.D., not a specialist in assessing the limitations he notes, particularly as it concerns psychological limitations.

Because the ALJ properly determined that Dr. Swedlund's opinion was not entitled

to controlling weight, and because he offered numerous good reasons for discounting the opinion that were consistent with the regulatory factors, the ALJ did not err in discounting Dr. Swedlund's opinion.

## II. Herz Opinion

Plaintiff next argues that the ALJ erred in assigning "very little weight" to consultative psychologist Dr. Herz's opinion, except "as to [Huichan's] ability to understand, remember and carry out simple instructions" which he gave "great weight." ((Pl.'s Br. (dkt. #13) 14; AR 25.)  However, plaintiff does not appear to argue that the ALJ failed to consider Dr. Herz's opinion under the proper regulatory factors; instead, she questions why the ALJ gave weight to part of the opinion while discrediting part.  (Pl.'s Br. (dkt. #13) 15.)

Here, too, however, the ALJ provided a reasonable explanation for his treatment. In particular, the ALJ discredited most of Dr. Herz's opinion because he found it "inconsistent with the overall evidence, normal mental status exams on presentations, limited treatment of medications with good results, and her busy life style." (AR 25.)  In particular, the ALJ emphasized that in treatment notes, Huichan presented as alert, cooperative, and in no apparent distress, as well as the lack of any medical evidence indicating that she was emotional or not able to stay focused.  (AR 25.)  He further pointed out that her depression was noted as stable on her medications.  (AR 672.)

Certainly, in general "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step."

16

*Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).  But "an ALJ is not required to credit the agency's examining physician in the face of . . . compelling evidence." *Id.*  Here, the ALJ was presented with a treatment record that included almost exclusively normal mental status reports, and little indication that Huichan would have trouble staying focused.  Presented with such evidence from Huichan's own treatment notes, the ALJ reasonably discounted Dr. Herz's inconsistent findings.  *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[E]ven if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported.") (internal citations omitted).

## III. RFC Finding

Plaintiff also argues that the ALJ's RFC finding is not supported by substantial evidence because he failed to incorporate all of Huichan's mental limitations.  (Pl.'s Br. (dkt. #13) 16.)  In support, plaintiff refers to an oft-cited line of Seventh Circuit decisions holding generally that an ALJ's step 3 finding of moderate CPP limitations must be adequately incorporated into the RFC.  (*Id.* (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019)).  In *O'Connor-Spinner* in particular, the Seventh Circuit explained that "[i]n most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620.  Still, no "specific terminology" is required, and an ALJ may properly omit the terms "concentration, persistence, and pace" if alternative phrasing properly "exclude[s] those tasks that someone with the claimant's

17

limitations would be unable to perform." *Id.* at 619.

Here, the ALJ limited Huichan to "simple routine tasks and simple work related decisions that I define as svp 1 or svp 2 type jobs; occasional interactions with co-workers, supervisors and the public; simple work related decisions commensurate with unskilled work." (AR 20.)  As previously noted, "SVP" refers to "specific vocational preparation," or "[t]he amount of time required for a typical claimant to:  learn the techniques; acquire the information; and develop the facility needed for average performance in a job." Program Operations Manual System ("POMS") DI 25001.001.  An SVP of 1 indicates that the job can be learned by short demonstration only.  *Id.*  An SVP of 2 indicates that the job requires more than a mere short demonstration, but no more than one month to learn.  *Id.*

In this way, the ALJ expressly adopted an RFC "consistent with her moderate functional limitations in concentration, persistence or maintaining pace."  (AR 27.)  This formulation is permissible because it excludes those specific tasks that Huichan was found unable to perform.   Thus, unlike in *O'Conner-Spinner*, where an ALJ assumed that employing limitations like "simple, repetitive work," the ALJ translated his finding of a moderate CPP limitation based on the underlying medical evidence.   Moreover, his translation is consistent with the fact that during the relevant time, Huichan received no counseling or mental health treatment, and except for one instance in which Huichan herself expressed some concern about her memory and forgetting appointments, the medical records show normal mental states and fail to note any inability to concentrate during the narrow window of coverage between February 6 and September 30, 2017.

18

As importantly, the ALJ's formulation is also generally consistent with the narrative portions of the state agency doctors' worksheet observations.  Dr. Jan Jacobson, Ph.D., wrote that Huichan "is able to sustain attention for simple, repetitive tasks for extended periods of two hour segments over the course of a routine workday/workweek within acceptable attention, concentration, persistence and pace tolerances.  Unable to do so for moderately detailed/complex tasks required sustained attention." (AR 96.)  And Dr. Esther Lefevre, Ph.D., wrote that Huichan was "noted to focus on her problems and ruminate, sometimes distracted but easily refocused.  She is able to sustain 2-3 step tasks but would likely not be able to maintain sufficient concentration for highlight complex tasks." (AR 82.)  *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("[I]n some cases, an ALJ may rely on a doctor's narrative RFC . . . where that narrative adequately encapsulates and translates those worksheet observations."); *Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) (unpublished) ("[T]he ALJ may reasonably rely on the examiner's narrative in Section III, at least where it is not inconsistent with the findings in the Section I worksheet.").

While Dr. Herz indicated in his "statement of work capacity" that Huichan's "[c]oncentration, attention and work pace are likely to be moderately disrupted at times due to personal preoccupations, mood and pain," the ALJ reasonably assigned little weight to this part of his opinion for reasons already discussed above.  Instead, the ALJ accommodated Dr. Herz's finding in part by including a limitation to occasional interactions with others, on the grounds that Dr. Herz's concerns were related to Huichan's emotional ability to interact with others.  (AR 27.)  Thus, the court finds the specific

19

phrasing in the ALJ's RFC reasonably excluded those tasks that the medical record suggested Huichan would not be unable to perform.[6]

## IV. Subjective Symptoms

Finally, plaintiff contends that the ALJ erred in considering Huichan's subjective symptoms.  Under SSR 16-3p, an ALJ must follow a two-step process in evaluating a claimant's report of subjective symptoms.  First, the ALJ must assess "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms."  *Id.*  Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities."  *Id.*  In making these evaluations, an ALJ's determination regarding a claimant's subjective symptoms is afforded "special deference."  *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008).  Courts may only overturn such a determination where it is "patently wrong."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (upholding an ALJ's credibility determination where the "ALJ's credibility determination was not flawless" but still "far from 'patently wrong'").

In his written decision, ALJ Bruce adopted the proper legal standard and reviewed Huichan's subjective reports, before ultimately concluding that:  "the claimant's medically

---

[6] For the first time in her reply brief, plaintiff asserts that the ALJ erred by disregarding the state agency doctors' opinions that Huichan should avoid concentrated exposure to pulmonary irritants and also failed to consider facts from Dr. Reintjes' consultative exam.  (Pl.'s Reply (dkt. #15) 1.) But because these arguments were not raised in her initial motion, however, they are waived.  *Brown v. Colvin*, 661 F. App'x 894, 895 (7th Cir. 2016) (citing *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013)).

determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 20-21.)  Specifically, the ALJ explained that her reports were not consistent with:  the "limited conservative treatment during the relevant period"; her "good and stable earnings and work history for years"; her various daily activities; and limited treatment of medications and some non-compliance with treatment recommendations.  (AR 24.)  Even more specifically, the ALJ acknowledged that the record indicated some swelling, but that it came and went, and that there was no support for her allegations of needing to elevate her legs.  (AR 24.)

Plaintiff lobs a number of unsuccessful arguments against the ALJ's determination, faulting him for not explaining which of Huichan's subjective reports were not credible, but an ALJ is not required to do so.  *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012) ("[A]n ALJ's credibility findings need not specify which statements were not credible.").  She also contends that the ALJ did not properly consider Huichan's daily activities, but as previously noted, "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'"  *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)).  In this case, the ALJ accurately summarized Huichan's daily activities and permissibly found that they reflected greater ability than that described in Huichan's subjective reports.  Next, plaintiff again questions the ALJ's characterization of Huichan's treatment as conservative, but as

explained above, this conclusion was reasonable in light of the record evidence.  Finally, plaintiff recites various, individual pieces of medical evidence that she argues supports Huichan's allegations, but the ALJ included a thorough discussion in which he acknowledged and refuted these allegations.  (*See* AR 20.)

In the end, this court is not empowered to reweigh the evidence, *Clifford*, 227 F.3d at 869, and none of the records suggest that the ALJ's determination was patently wrong.  On the contrary, as outlined above, each of his material determinations were reasonably explained and supported by the evidence.  Moreover, many of the allegations cited by plaintiff were in fact accommodated by the ALJ's RFC.  For example, Huichan's alleged dizziness and her inability to stand for more than a short duration were accommodated by the limitation to sedentary work.  Thus, this court must affirm the Commissioner's findings in this case

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying plaintiff Debra Jean Huichan's application for disability insurance benefits is AFFIRMED.

Entered this 3rd day of December, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

22